# 11-4366

## United States Court of Appeals
## for the
## Second Circuit

JAMES C. McELWEE,

*Plaintiff-Appellant,*

-vs-

COUNTY OF ORANGE,

*Defendant-Appellee.*

On Appeal From The United States District Court, Southern District of New York

## PLAINTIFF'S REPLY BRIEF

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
*Counsel for plaintiff-appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................... ii

POINT I:    PLAINTIFF HAS A DISABILITY UNDER FEDERAL LAW .... 1

   A.    Plaintiff is substantially limited in the major life activity
       of interacting with others .................................. 1

   B.    Defendant does not challenge plaintiff's arguments that he
       is substantially limited in other major life activities ............ 8

POINT II:   THE JURY MAY FIND THAT ROBIN DARWIN KNEW
            OR SHOULD HAVE KNOWN THAT PLAINTIFF HAS
            A DISABILITY UNDER FEDERAL LAW .................. 8

POINT III: PLAINTIFF WAS A QUALIFIED INDIVIDUAL UNDER
            FEDERAL LAW ...................................... 11

POINT IV: DEFENDANT DISCRIMINATED AGAINST PLAINTIFF
            IN TERMINATING HIM BECAUSE OF BEHAVIOR THAT
            CONSTITUTED A MANIFESTATION OF HIS
            DISABILITY ........................................ 13

POINT V:    PLAINTIFF WAS DENIED A REASONABLE
            ACCOMMODATION ................................. 20

   A.    Darwin made no effort to accommodate plaintiff's disability ..... 21

   B.    Plaintiff's failure to request an accommodation is not fatal
       to his claim ............................................ 23

CONCLUSION ................................................... 25

CERTIFICATION ................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Ascani v. Hofstra University*, 1999 U.S. App. LEXIS 7654 (2d Cir. 1999) . . . . . 19

*Brady v. Wal-Mart Stores*, 531 F.3d 127 (2d Cir. 2008) . . . . . . . . . . . . . . . 8, 9, 24

*Bragdon v. Abbott*, 524 U.S. 624 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996) . 24

*Francis v. Runyon*, 928 F. Supp. 195 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . 12

*G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552 (S.D.N.Y. 2010) . . 4

*Graves v. Finch Pruyn & Co.*, 457 F.3d 181 (2d Cir. 2006) . . . . . . . . . . . . . . . . 23

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 20

*Husowitz v. Runyon*, 942 F. Supp. 822 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . 19

*Jacques v. DiMarzo, Inc.*, 386 F.3d 192 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 5, 6, 7

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208 (2d Cir. 2001) . . . . . . 17

*Nowacki v. Astrue*, 2010 U.S. Dist. LEXIS 144017 (D. Conn. 2010) . . . . . . . . . . 4

*Owens v. New York City Housing Authority*, 934 F.2d 405 (2d Cir. 1991) . . . . . 12

*Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997) . . . . . . . 12

*Powell v. v. National Bd. of Medical Examiners*, 364 F.3d 79 (2d Cir. 2004) . . 12

*School Board of Nassau County v. Arline*, 480 U.S. 273 (1987) . . . . . . . . . . . . . 11

*Sista v. CDC Ixis North America*, 445 F.3d 161 (2d Cir. 2006) . . . . . . . . . . . 11, 20

*Thornley v. Penton Pub., Inc.*, 104 F.3d 26 (2d Cir. 1997) . . . . . . . . . . . . . . . . 12

*Toyota Motor Manufacturing v. Williams*, 533 U.S. 184 (2002) . . . . . . . . . . . . . . 6

*Tylicki v. St. Onge*, 297 Fed. Appx. 65 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 19

*Workman v, Mingo County Schools*, 667 F. Supp. 2d 679 (S.D. W.Va. 2009) . . . 4

**Statutes**

42 U.S.C. § 12102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 12112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

**Regulations**

29 C.F.R. § 1630.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 8

EEOC Enforcement Guidance: Reasonable Accommodation and Undue
Hardship under the Americans with Disabilities Act (Oct. 2002, revised) . . 24-25

## PRELIMINARY STATEMENT

Plaintiff-appellant James C. McElwee submits this reply brief in further support of his appeal from the grant of summary judgment on his claims under the Americans with Disabilities Act and the Rehabilitation Act. As plaintiff argued in his principal brief, he has a disability under federal law because he has an Autism Spectrum Disorder. The jury may find that plaintiff was terminated from his volunteer position with the Valley View Nursing Home in Orange County, N.Y., because of his disability. Moreover, defendant made no effort to reasonably accommodate plaintiff's disability. This Court should vacate summary judgment.

## POINT I

## PLAINTIFF HAS A DISABILITY UNDER FEDERAL LAW

### A. Plaintiff is substantially limited in the major life activity of interacting with others

Defendant ignores evidence submitted by plaintiff (JA 83-90), his mother (JA 64-82) and his therapists (JA 142-44) about his limited social interaction skills. Yet, along with evidence submitted by defendant in support of its summary judgment motion – including the Robin Darwin affidavit and the "transcript" of her conversations with plaintiff (JA 42-43) – this evidence permits a jury to find that plaintiff is substantially limited in the major life activity of interacting with others.

Plaintiff engages in both fleeting and intense eye contact and has odd

speech and "sing song" inflections in conversation. (JA 76, 80, 143). In addition, when interacting with others, plaintiff exhibits unusual and bizarre facial expressions, gestures and body postures without respecting personal space. (JA 76, 79, 80, 142-43). In the course of his limited conversational skills, plaintiff engages in one-sided and self-centered conversations through verbal repetition and inappropriate tangents and lacks social and emotional reciprocity. (JA 76, 78-80, 143). Nor does plaintiff listen to others, understand their feelings or recognize that they cannot "read his thoughts." (JA 78, 143). He cannot respond to social cues or body language. (JA 79, 143). Plaintiff also perseverates and interprets conversations and expressions literally. (JA 76, 79, 143). He is unable to see matters from another's viewpoint and is not sensitive to interrupting others. (JA 78, 80, 143). While defendant suggests that plaintiff is simply alleging "ineffective, inappropriate communication" (def's br. at 19) and that "[t]he record is devoid of evidence sufficient to establish that Appellant's impairment limited his ability to interact, rather than just impacting the appropriateness of his communications" (def's br. at 20), these are the hallmarks of an individual who is substantially impaired in his ability to interact with others.

The Americans with Disabilities Amendments Act (ADAAA) prohibits the kind of hair-splitting that defendant employs in arguing that plaintiff does not have a disability under federal law. Defendant argues that "it was his *manner* of

2

interacting and not his *ability* to interact at a basic fundamental level that was impaired." (Def's br. at 21) (emphasis in original). Yet, in enacting the ADAAA, Congress intended that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 42 U.S.C. § 12101 *note*.

The EEOC's ADAAA regulations provide useful guidance. Autism is a presumed federal disability. 29 C.F.R. § 1630.2(j)(3)(iii). *See also*, 29 C.F.R. Pt. 1630, App. § 1630.2(j)(3) (noting that the ADAAA covers persons with developmental disabilities). While defendant argues that "Appellant is not autistic" in that "[h]e either has Asperger's or [Pervasive Developmental Disorder- Not Otherwise Specified]," plaintiff's therapists state that while he is formally diagnosed with PDD-NOS, "it may be best to indicate that he is diagnosed with an autism spectrum disorder, because that is a term increasingly familiar to the general public." (JA 143). Moreover, as fully set forth in the proposed amicus brief, PDD-NOS is an Autism Spectrum Disorder, and the DSM-IV-TR defines PDD-NOS as "a severe and pervasive impairment in the development of reciprocal social interaction." (Proposed Brief of National Disability Rights Network and Autism Speaks, at 6). *See also, id.*

3

at 6 ("Persons with PDD-NOS have a 'marked impairment of social interaction, communication, and/or stereotyped behavior patterns or interest' ... and 'difficulty tuning in to the affective cues in social situations'") (citing *Workman v. Mingo County Schools*, 667 F. Supp. 2d 679, 681 n. 2 (S.D. W.Va. 2009) and *Nowacki v. Astrue*, 2010 U.S. Dist. LEXIS 144017, at \*6-9 (D. Conn. July 19, 2010)); *G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 554 (S.D.N.Y. 2010) (noting that PDD-NOS is "a form of autism"). Indeed, as defendant acknowledges, "people with Asperger's '[h]ave a very hard time relating to others. It doesn't mean that they avoid social contact. But they lack instincts and skills to help them express their thoughts and feelings and notice others' feelings.'" (Def's br. at 22) (citing www.webmd.com/brain/autism/tc/aspergers-syndrome-topic-overview). The website cited by defendant summarizes the symptoms for Asperger's that resemble plaintiff's mannerisms and interaction skills, and it adds that "[p]eople with Asperger's syndrome have some traits of autism. For example, they may have poor social skills, prefer routine, and not like change. But unlike those who have autism, children with Asperger's syndrome usually start to talk before 2 years of age, when speech normally starts to develop." This is relevant here because the record reflects that plaintiff's PDD-NOS is more severe than Asperger's. (JA 80).

Plaintiff's maladaptive behaviors are consistent with an autism diagnosis.

4

In addition to his limited interaction skills, he manifests anxiety from changes in his routine or expectations (JA 80, 143), acts immaturely and maintains a restricted pattern of interests and range of routine. (JA 79-80). He overreacts to disagreement, is resistant to logical redirection and is stuck in ways of doing or seeing things. (JA 80, 143). Plaintiff cannot accept criticism (JA 74, 143) and engages in repetitive, stereotyped characteristics in behavior, communication and thought processes. (JA 143). In arguing that plaintiff is not an individual with a disability under federal law, defendant makes reference to none of this evidence. Yet, the jury may credit this evidence in ruling in plaintiff's favor.

Defendant argues that the ADAAA does not undermine *Jacques v. DiMarzo, Inc.*, 386 F.3d 192 (2d Cir. 2004). However, as outlined in appellant's opening brief at pp. 27-30, *Jacques* provides a narrow definition of "disability" that the ADAAA has repudiated. While *Jacques* required plaintiffs to show that "the impairment *severely limits* the plaintiff's ability to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people – *at the most basic level* of these activities," 386 F.3d at 203 (emphasis supplied), under the ADAAA, plaintiffs are no longer required to show that their impairments "severely limit" a major life activity. 29 C.F.R. § 1630.2(j)(1)(ii); 29 C.F.R. § Pt. 1630 App, § 1630.2(j)(1)(ii). The strict test under *Jacques* is inconsistent with the ADAAA's

5

intent to broaden the definition of "disability" by rejecting similar language adopted by the Supreme Court. *See*, 42 U.S.C. § 12102(b)(4) (ADAAA's findings and purposes) (noting that Congress rejected "the standards enunciated by the Supreme Court in the case of *Toyota Motor Manufacturing v. Williams*, 533 U.S. 184 (2002), that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA, 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives'").

Defendant misreads *Jacques* in arguing that it fully survives the ADAAA. It argues that "[t]he standard set forth in *Jacques* was not, as Appellant contends, a measure of the degree of the severity of the impairment necessary to meet the definition of disability in the ADA. Rather, it was a distinction as to the activity that is impacted by the impairment – the distinction between 'getting along with others' versus 'interacting.'" (Def's br. at 17). Yet, *Jacques* states that the plaintiff must prove that his impairment severely limits his ability to interact with others: "a plaintiff is 'substantially limited' in 'interacting with others' when the mental or physical impairment *severely limits* the fundamental ability to communicate with others. This

6

standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people – *at the most basic level of these activities*." 386 F.3d at 203 (emphases supplied).[1]  In other words, under *Jacques*, "interacting with others" was a protected disability, but, in order to qualify under the pre-amended ADA, the plaintiff had to show that his interactions with others were severely limited.  The ADAAA rejects that strict test.

Finally, defendant argues that plaintiff is not substantially limited in his interactions with others because Robin Darwin observed him socializing with people at the facility.  (Def's br. at 23).  This argument ignores the substantial evidence that plaintiff advanced on the summary judgment motion about his limited interaction and social skills.  It also ignores ADAAA standards: "In determining whether an individual has a disability under the 'actual disability' or 'record of' prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve.  For example, someone with a learning disability may achieve a high level of academic success, but may

---

[1] While defendant argues that plaintiff does not "contend that the district court misapplied the *Jacques* standard"(def's br. at 18), this is not true.  Plaintiff challenges the district court's application of *Jacques* at pp. 30-31 of his principal brief.

7

nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." 29 C.F.R. § 1630.2(j)(4)(iii). That plaintiff communicates and eats lunch with colleagues does not establish as a matter of law that he is not substantially limited in the major life activity of interacting with others. Even prior to the ADAAA, the statute did not require proof of "utter inabilities." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998).

## B.    Defendant does not challenge plaintiff's arguments that he is substantially limited in other major life activities

In his principal brief at pp. 25-27, plaintiff argues that he is substantially limited in (1) caring for himself and (2) working. Defendant does not challenge these arguments at all. Nor did the district court. Summary judgment was improper.

## POINT II

## THE JURY MAY FIND THAT ROBIN DARWIN KNEW OR SHOULD HAVE KNOWN THAT PLAINTIFF HAS A DISABILITY UNDER FEDERAL LAW

In *Brady v. Wal-Mart Stores*, 531 F.3d 127 (2d Cir. 2008), sustaining a verdict in favor of a disabled employee, this Court found that management perceived him as disabled. In that case, a supervisor "herself testified that she regarded Brady to be slow and that she 'knew there was something wrong' with him." *Id.* at 134.

8

Since management had reason to know that Brady was disabled because of the effects of his Cerebral Palsy, it had a duty to reasonably accommodate him. *See, id.* at 135 ("an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled").

Like the formal report drafted by plaintiff's therapists, which notes the "bizarreness of his nonverbal behaviors" (JA 142-44), Loretta McElwee's declaration permits the inference that defendant's agents, including Robin Darwin, knew or reasonably should have known that plaintiff has a disability. *See also*, JA 65 ¶ 5 (Mrs. McElwee attests that "[d]epending on the circumstances of interaction, one can usually notice within 10 to 30 minutes that James has a developmental disability, if not sooner"). The psychological assessment annexed to Mrs. McElwee's declaration further supports that inference. (JA 76-77 [Behaviorial Observations]). Like the supervisor in *Brady*, Darwin testified that plaintiff "may have appeared to look a little slow" based on "his look, his face." (JA 105). Darwin also recalled that, in meeting with plaintiff to discuss the complaints against him, he acted strangely. *See*, JA 109 ("when we spoke – certain things that he said, his mannerisms were very unusual"); JA 111 (it struck Darwin as unusual that plaintiff said that he talks to and looks at a female employee); JA 111 (plaintiff's reference to God was "not something you

9

would normally hear from someone"); JA 111-12 (it was unusual for plaintiff to make a hand-motion slitting his throat during the meeting); JA 113 ("he just looked odd. It just was bizarre" when plaintiff made strange faces during the meeting); JA 115 (it was "disturbing" when plaintiff said Darwin was a "conduit of God" in punishing him); JA 116 (Darwin agreed that plaintiff "was saying things you wouldn't normally hear"); JA 119 ("[i]n the course of our conversation, I would say he said unusual things"). The "transcript" of plaintiff's conversation with Darwin shows a 35 year-old man who could not defend himself or coherently discuss his workplace behavior with a supervisor. Plaintiff made irrelevant observations about his past, worried about his mother's reaction to his workplace discipline and made bizarre hand and facial gestures. (JA 42-43). As she has a Master's degree in health services and management (JA 98), the jury may find that Darwin knew or should have known that plaintiff was developmentally-disabled based on his unusual mannerisms, gestures and statements.

Finally, the notes from Darwin's conversation with plaintiff's mother make reference to his disability. (JA 127). After Darwin met with plaintiff, Loretta McElwee told her that the facility should not discriminate against plaintiff because of his disability. *Id.* Despite Darwin's conversation with plaintiff's mother on November 30, 2009, Darwin terminated plaintiff's involvement with the program the

10

next day.  (JA 138).[2]

## POINT III

## PLAINTIFF WAS A QUALIFIED INDIVIDUAL UNDER FEDERAL LAW

In order to make out a *prima facie* case of disability discrimination, "a

plaintiff must show by a preponderance of the evidence that: '(1) his employer is

subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was

otherwise qualified to perform the essential functions of his job, with or without

reasonable accommodation; and (4) he suffered adverse employment because of his

disability.'" *Sista v. CDC Ixis North America*, 445 F.3d 161, 169 (2d Cir. 2006).

Defendant argues that plaintiff was not qualified for his position because

he was "engaging in a longstanding course of inappropriate conduct with numerous

female employees, nursing students, and visitors to the facility." (Def's br. at 25).

However, this Court in *Sista* clarified that the question whether an ADA

discrimination plaintiff is qualified for his position is limited to whether he could

perform his job duties.  445 F.3d at 171-72. *See also*, *School Bd. of Nassau County

v. Arline*, 480 U.S. 273, 288 n.17 (1987) ("'[a]n otherwise qualified person is one

who is able to meet all of a program's requirements in spite of his handicap.'  In the

---

[2] In addition, in 1999, plaintiff's therapist advised the County's Personnel
Department that plaintiff has a disability.  (JA 145).

11

employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question"); *Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir. 1991) ("*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* case. [A plaintiff] only needs to demonstrate that she possesses the basic skills necessary for performance of [the] job]"); *Powell v. National Bd. of Medical Examiners*, 364 F.3d 79, 84-85 (2d Cir. 2004) ("[a] qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity'"). Moreover, "'misconduct' ... [does] not [necessarily] correspond to the question of satisfactory performance." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997).[3]

When she spoke with plaintiff about the allegations against him, Darwin said that he was a good volunteer. Her notes from the conversation state:

---

[3] Defendant misconstrues the cases in arguing that plaintiff's alleged inappropriate behavior renders him unqualified under the ADA. This Court in *Sista* confirmed that while the employer may cite the plaintiff's violent propensities as a legitimate reason for terminating his employment, that defense only arises after plaintiff makes out the *prima facie* case. 445 F.3d at 172. In interpreting the ADA this way, this Court expressly repudiated the contrary cases cited in defendant's brief, including *Francis v. Runyon*, 928 F. Supp. 195 (E.D.N.Y. 1996) and *Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997).

12

[McElwee]: Don't I do a good job volunteering?

[Darwin]: Yes you do a good job volunteering, it has nothing to do with your work.

(JA 42).

Plaintiff is a qualified individual because this longtime volunteer satisfied the facility's eligibility requirements and he successfully participated in the volunteer program for years. As there is no evidence to the contrary, defendant's argument that he was not qualified is meritless.

## POINT IV

### DEFENDANT DISCRIMINATED AGAINST PLAINTIFF IN TERMINATING HIM BECAUSE OF BEHAVIOR THAT CONSTITUTED A MANIFESTATION OF HIS DISABILITY

Defendant argues that it terminated plaintiff's involvement in the volunteer program "after a reasonable investigation due to his actions and behavior towards female employees, students and visitors, which made them feel uncomfortable and which subjected Valley View to potential liability for sexual harassment under Title VII if they took no action to remedy the conduct." (Def's br. at 29-30). The jury may find otherwise.

Defendant's argument assumes that plaintiff engaged in sexual harassment. The evidence does not compel that inference. Plaintiff worked in the volunteer

13

program from 1996 through November 2009. (JA 83 ¶ 3). When Robin Darwin

spoke with plaintiff about Martha Thompson's complaint, she told him that this was

a recent development, *i.e.*, "This is something new that you are doing." (JA 42).

After plaintiff and Darwin talked about employee Amy Fey's complaints about him,

Darwin investigated further, discovering other complaints about plaintiff's behavior.

(JA 35-38 ¶¶ 30-52). Although Darwin became Assistant Administrator in July 2006

(JA 30 ¶ 2), nearly all of these allegations were new to her. The jury may find that

employees did not previously complain about plaintiff because they knew he was

developmentally-disabled and did not think he posed a threat to anyone. Yet, while

Darwin released plaintiff from the volunteer program right after she completed her

investigation (JA 38 ¶¶ 53-54), she did not speak again with plaintiff for his side of

the story. Had Darwin done so, plaintiff could have placed these incidents in context,

conclusively negating any inference of sexual harassment. *See*, Plaintiff's aff. in opp.

to summary judgment motion, at JA 84-89 ¶¶ 7-23. A typical response from plaintiff

is set forth in his affidavit with respect to Martha Thompson, whose complaint

triggered Darwin's investigation:

> 7.     In Robin Darwin's notes of her interview with Martha
> Thompson, she writes that Thompson told her that she
> was uncomfortable around me and that I waited in the
> Town Center at the Nursing Home and walked behind
> her when going to calls.

14

8.  The notes further state that when I walked in the hall I looked at Thompson's rear-end. Thompson also told Darwin that on September 25, 2009, while walking in the hallway by the cafeteria, Thompson and I walked past each other and she turned and "caught him." She asked me what was going on. According to Thompson, I said, "I thought someone [was] calling me."

9.  Thompson also told Darwin that, a few times by the switchboard, when she stopped walking, I stopped walking, as I was following her every move.

10. I had little interaction with Thompson. I do not recall speaking with her socially. I certainly never intended to make anyone feel uncomfortable. She may have inferred that I was looking at her in a sexual way, but I was not. I regard myself as a gentleman, and I would hold the door open for men and women. I am aware that, with my disability, people might take my facial expressions and comments the wrong way. But, having worked there 13 years, I understood that colleagues who got to know me were aware of my disability and knew I that was harmless.

11. The notes from the Thompson interview state that I have waited in the gift shop "to watch her go out." I suspected that, for whatever reason, Thompson did not like having me around, so I waited for her to leave the shop to keep my distance from her.

12. Thompson also told Darwin that on one occasion in the parking lot, I intentionally situated my car near her car and rolled down my windows to look at her. I do not know what kind of car Thompson drives. If I parked near her, it was coincidence. I do not recall rolling down my windows to look at her. I believe that

> Thompson was interpreting my behavior the wrong way, but I cannot control how she perceives me.

(JA 84-85).

The rest of plaintiff's affidavit shows that he did not even know some of the people who had allegedly complained about him (JA 85 ¶ 13) or that someone must have taken his comments the wrong way. (JA 86 ¶ 15). On some occasions, plaintiff denied any unusual conduct (JA 86 ¶ 16), placed his conduct in context (JA 86-87 ¶ 17) or said that he was joking with colleagues with whom he felt comfortable. (JA 88-89 ¶ 23-24). Many of these episodes took place years earlier. (JA 86-89 ¶¶ 16, 18, 20, 23). And, as set forth in plaintiff's affidavit, some of the allegations bore directly upon plaintiff's disability:

> 20. The notes also reflect Darwin's conversation with Irene Simpson, the Activities Supervisor, who told Darwin that I would have periods of overanxiousness, where I would be pacing, talking to myself and I was asked to not come in. She said she "always felt he had the potential to be violent due to his size, and I would say to her, "do you realize what I could do to you?" This happened 15 years ago. I do not recall saying this to Simpson. The pacing and talking to myself and overanxiousness is a symptom of my Asperger's. At the time I was not taking the medication that I take today, and I did not have much self-confidence. It was much more difficult to deal with my disability as a young man than as a full-grown adult.

(JA 88).

16

As the jury may conclude that Darwin knew that plaintiff was developmentally-disabled and thus had a disability under federal law, it may find that she based her decision to terminate his involvement with the volunteer program on the manifestations of his disability, and that this adverse decision stemmed from "prejudice, stereotypes, or unfounded fear" of plaintiff's conduct. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220 (2d Cir. 2001). Contrary to defendant's argument, Darwin's one-sided investigation into plaintiff's conduct was unreasonable. While his behavior may have made some Valley View employees feel uncomfortable, plaintiff did not threaten them with physical harm or touch them (JA 117-18), and the jury may find that his alleged inappropriate interactions stemmed from his disability, which significantly affects his social skills. Yet, after her initial meeting with plaintiff on November 24, 2009 to briefly discuss some of the allegations against him (JA 42-43), Darwin did not meet with plaintiff or his mother or his therapists to discuss his behavior or to further lay out the case against him. That meeting would have allowed plaintiff to defend himself and further acquaint Darwin with his disability and assure her that plaintiff was not sexually harassing anyone. Darwin had every opportunity to hold these meetings. Darwin's handwritten notes show that plaintiff's mother told her that her son "[should not] be discriminated

17

[against] because he looking at people" [sic]. (JA 127). Loretta McElwee also told Darwin, "[d]on't want to discriminate because he has a disability." *Id.* After plaintiff was terminated from the program, his therapist sent Darwin a fax requesting an opportunity discuss plaintiff's disability. (JA 130-31). That conversation could have compelled Darwin to change her mind about plaintiff. Darwin did not contact the therapist. (JA 144).

In support of its argument that plaintiff was fired in good faith to protect facility employees, defendant views the evidence in the light most favorable to its position. Defendant summarizes Darwin's November 24, 2009 meeting with plaintiff as follows:

> During the course of the meeting, plaintiff admitted to "looking at and talking to" at least two female employees, and also told Darwin and Fey that when he was in high school he made "a mean phone call to a girl, saying nasty/dirty things" and that the police were called as a result of that incident. (JA at 33 ¶ 18). He also stated that there "needs to be punishment and now," while making a gesture to simulate slitting his throat. When questioned about what he meant by that, he said he deserved to be punished when he did bad things. (JA at 33 ¶¶ 19-20). His words and behavior during this meeting were disturbing to Darwin, and she became quite concerned about whether Mr. McElwee was a liability and whether it was safe to permit him to continue to volunteer.

(Def's br. at 26).

Yet, Darwin's "transcript" memorializing her final conversation with

18

plaintiff shows her interrogating a frightened man over allegations that he made women feel uncomfortable. Darwin's suggestive questioning forced plaintiff to reveal embarrassing and irrelevant personal matters from high school. (JA 42-43). The behavior that defendant cites as "disturbing" must be placed in context. Plaintiff is not mentally-ill or violent but a disabled individual who falls within the autism spectrum. As Darwin had never previously heard any complaints about plaintiff and he had successfully volunteered at the facility since 1996, defendant has not shown as a matter of law that Darwin had no choice but to immediately terminate his involvement with the volunteer program in order to protect staff.

The cases in defendant's brief are distinguishable in that they involve plaintiffs – some of whom were mentally ill – who physically threatened their superiors. *See, Ascani v. Hofstra University*, 1999 U.S. App. LEXIS 7654, at * 4 (2d Cir. April 9, 1999) (plaintiff physically threatened her professor and pleaded guilty to harassment and trespass); *Husowitz v. Runyon*, 942 F. Supp. 822, 834 (E.D.N.Y. 1996) (defendant could discipline bi-polar plaintiff who "was a disruptive influence" by threatening his supervisor with physical violence).

Defendant cites *Tylicki v. St. Onge*, 297 Fed. Appx. 65 (2d Cir. 2008), for the proposition that "the ADA and the Rehabilitation Act permit [the college] to discipline a student even if the student's misconduct is the result of disability" and

19

that "[the college] was entitled to suspend Tylicki even if his conduct was a manifestation of his alleged disability." (Def's br. at 28). However, that language is in the context of a college's right to discipline a disabled student without a "manifestation hearing," a procedure unique to the Individuals with Disabilities in Education Act, which applies to students in public schools. Nothing in this record compares to the plaintiffs whose violent and threatening personalities warranted dismissal. While this Court stated in *Sista v. CDC Ixis North America* that the ADA does not require "that employers countenance dangerous misconduct, even if that misconduct is the result of a disability," 445 F.3d at 172, the jury may find that plaintiff did not engage in "dangerous misconduct" but simply lacked appropriate social interaction skills because of his disability.

## POINT V

## PLAINTIFF WAS DENIED A REASONABLE ACCOMMODATION

"Title I of the ADA states that 'the term 'discriminate' includes ... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (quoting 42 U.S.C. §

20

12112(b)(5)(A)).

## A. Darwin made no effort to accommodate plaintiff's disability

Darwin told plaintiff that various female employees complained that he violated their personal space and they felt uncomfortable around him. However, Darwin did not meet with plaintiff and his colleagues to discuss the allegations. (JA 121-22). Nor did defendant attempt to educate facility employees about plaintiff's disability or to emphasize that plaintiff was not trying to make anyone feel uncomfortable.

The jury may find in plaintiff's favor on his failure-to-accommodate claim. The record does not compel the conclusion that plaintiff is a violent man whose dangerous threats could not be reasonably accommodated. At worst, others in the workplace misinterpreted plaintiff's behavior. However, as plaintiff attests, "I cannot control how [others] perceive[] me." (JA 85 ¶ 12). "Having worked there 13 years, I understood that colleagues who got to know me were aware of my disability and knew that I was harmless." (JA 85 ¶ 10).

Defendant ignores the cases cited in plaintiff's principal brief to the effect that "federal courts have required decisionmakers to pursue reasonable accommodations for those deemed a health and safety risk before they are summarily terminated from a government program for alleged inappropriate behavior." (Appt's

21

br. at 41-42). While defendant suggests that plaintiff wants to force public entities to "accommodate" persons with mental disorders by trying to "be more understanding" of their harassment (def's br. at 32), that is not true. The jury is not required to find that plaintiff was "harassing" women, and it was not an undue burden for nursing home officials to sit down with plaintiff and his female colleagues to clear the air over his unintentional behavior. Nor was it an undue burden for the County to educate staff, residents and volunteers about the nature of plaintiff's disabilities, particularly since he was a valued volunteer and he had never previously behaved like this at the facility, as Darwin told him "this is something new that you're doing." (JA 42). Yet, the County has not trained anyone to handle personnel disputes arising from developmental disabilities. (JA 118).

For these reasons, defendant's reliance on *Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009), is misplaced. The plaintiff in *Harris* challenged the state's refusal to reinstate his medical license after he committed fraud and engaged in improper medical practices. His lawsuit alleged that, in revoking his license, the state did not accommodate his learning disabilities. *Id.* at 74. This Court rejected his claim because the "complaint does not ... identify how Harris's disabilities affected the behavior that caused the revocation of his license, nor how those disabilities could be accommodated to reform this behavior." *Id.* As Harris wanted the state to relax

22

its licensing standards to accommodate his disability, the Complaint failed to state a claim. *Id.*

While the plaintiff in *Harris* engaged in serious professional misconduct and lost his initial administrative challenge in state court, plaintiff admits to no comparable offenses. The jury may instead find that facility employees misinterpreted his behavior and complained about him to Darwin, who jumped to conclusions and decided that plaintiff was harassing staff. Plaintiff is not asking this Court to relax the standards governing volunteers at Valley View. Instead, he challenges defendant's failure to recognize that this long-time volunteer posed no threat to anyone and that his alleged interaction with Martha Thompson and other women resulted in a misunderstanding that the facility could have easily cleared up by educating staff about the nature of his disability.

## B. Plaintiff's failure to request an accommodation is not fatal to his claim

Defendant argues that plaintiff's failure to request a reasonable accommodation entitles it to summary judgment. (Def's br. at 35). Citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006), defendant notes that plaintiffs are generally responsible for requesting the accommodation. However, this Court has modified *Graves* in holding that the employer must offer an accommodation "where

23

the disability is obvious or otherwise known to the employer without notice from the

employee." *Brady v. Wal-Mart Stores*, 531 F.3d at 135. The Court explained,

> This view is consistent with the statutory and regulatory
> language, which speaks of accommodating "known" disabilities,
> not just disabilities for which accommodation has been requested.
> Indeed, a situation in which an employer perceives an employee
> to be disabled but the employee does not so perceive himself
> presents an even stronger case for mitigating the requirement that
> the employee seek accommodation. In such situations, the
> disability is obviously known to the employer, while the
> employee, because he does not consider himself to be disabled, is
> in no position to ask for an accommodation. A requirement that
> such an employee ask for accommodation would be tantamount
> to nullifying the statutory mandate of accommodation for one
> entire class of disabled (as that term is used in the ADA)
> employees.

*Id.* at 135.

As plaintiff is limited in his communication skills and was a full-time

volunteer who most likely was unaware of his rights under the ADA, his failure to

request an accommodation for his obvious disability is not fatal to his claim. Courts

and the EEOC recognize that a request is not necessary when a person's disability

interferes with his ability to make such a request. *See, Bultemeyer v. Fort Wayne

Community Schools*, 100 F.3d 1281, 1285-87 (7th Cir. 1996); EEOC Enforcement

Guidance: Reasonable Accommodation and Undue Hardship under the Americans

with Disabilities Act, Question 40 (Oct. 2002, revised), available at

24

http://www.eeoc.gov/policy/docs/accommodation.html.

## CONCLUSION

This Court should vacate the grant of summary judgment and remand this

case to the district court for further proceedings.

Dated:    March 16, 2012

Respectfully submitted,

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
*Counsel for plaintiff-appellant*

25

## CERTIFICATE OF COMPLIANCE

Stephen Bergstein, counsel for plaintiff-appellant, affirms that this reply brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The brief contains 5,715 words.

STEPHEN BERGSTEIN

26